UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

TONI JONES

CIVIL ACTION

VERSUS

PNK (BATON ROUGE) PARTNERSHIP D/B/A L'AUBERGE CASINO & HOTEL OF BATON ROUGE

NO.: 16-00843-BAJ-EWD

RULING AND ORDER

Before the Court is the **Motion for Summary Judgment (Doc. 32)** filed by Defendant PNK (Baton Rouge) Partnership d/b/a L'Auberge Casino & Hotel of Baton Rouge. Plaintiff Toni Jones filed an opposition. (Doc. 39). For the following reasons, the **Motion for Summary Judgment (Doc. 32) is GRANTED IN PART** and **DENIED IN PART.**

I.  BACKGROUND

This is an employment discrimination lawsuit. The facts taken in the light most favorable to Plaintiff are as follows. Defendant L'Auberge Casino & Hotel in Baton Rouge, Louisiana hired Plaintiff, an African-American woman as a full-time Table Games Floor Supervisor in July of 2012. (Doc. 39-3 at p. 19). About a year and a half later, on December 9, 2013, Defendant promoted Plaintiff to Assistant Food and Beverage Manager in the Bon Temps Buffet at the Casino. (*Id.* at p. 23, 32-1 at ¶ 1 and 39-1 at ¶ 1). Before taking the Assistant Manager position, she told the Director of Food and Beverage, Sean Malone, that she was a single parent and

therefore could not work nights. (Doc. 39-5 at p. 27). She asked him if the majority of her hours could be during the day or on weekends, and Malone assured Plaintiff that it would not be a problem to schedule the majority of her work during the day. *Id.*

When she was promoted, Plaintiff was instructed to report to the Food and Beverage Manager Rhonda Johnson. (Doc. 39-3 at p. 26). Plaintiff was one of four Assistant Managers, including Chaunsey Miner, Derek Gaspard, and Kenneth Arcenaux. *Id.* After being promoted to Assistant Manager, but before she actually started working at the buffet, Arcenaux called Plaintiff at home and asked her if she was single. *Id.* at p. 35. Plaintiff told him that she was single. *Id.* Plaintiff had never met or spoken to Arcenaux before. *Id.* at p. 36. Arcenaux also called Plaintiff and said "I just called to tell you that I love you . . . [and] I'm looking forward to you coming to the buffet." *Id.* at p. 36.

After Plaintiff started working at the buffet, Arcenaux's advances continued. He repeatedly asked Plaintiff to go out for drinks. *Id.* at p. 36. Arcenaux also repeatedly commented on Plaintiff's appearance or made advances at least twice each shift they worked together. (Doc. 168 at p. 45). For example, he said "Oh, who is that coming this way, nice arms, oh, nice legs. Oh, that's just Toni." (Doc. 39-3 at p. 36). He also told Plaintiff "That's a nice skirt you got on. I like the way it fit." *Id.* at p. 44. And he told Plaintiff that she had nice legs and "ought to wear skirts more often." *Id.* Also whenever Plaintiff and Arcenaux overlapped shifts, he would say "who is that good looking woman, oh, that is just Toni." *Id.* at p. 45.

Another time, when Plaintiff was at a concert on her lunch break, Arcenaux waited until Plaintiff had turned around and took a picture of her buttocks and forwarded the photo to other people. *Id.* at p. 37. Derek Gaspard, another Assistant Manager, showed her the photo. *Id.* The day before Plaintiff was terminated, Arcenaux again asked Plaintiff to get drinks with him, and later in the day he said "I don't know why you're fighting it, you might as well just go on and give in[.]" *Id.* at p. 36.

Plaintiff attempted to stop Arcenaux's advances by rebuffing him and moving on to other subjects. *Id.* at p. 41. She also tried to never be alone with him. *Id.* Plaintiff complained about Arcenaux's behavior on multiple occasions. About a month after she started working as an Assistant Manager, Plaintiff complained about Arcenaux to Kizzy Smith in Human Resources. *Id.* at p. 45. Smith told Plaintiff to keep him posted. *Id.* Plaintiff complained again to Smith in February and March of 2014. *Id.*

Although Plaintiff was promised that she would work days, during her first two weeks at the buffet, Plaintiff worked the night shift from 2:00 PM until the restaurant closed. (Doc. 32-39). As soon as Plaintiff started working, she complained about her schedule to Malone. (Doc. 32-43 at ¶ 7). She also told Johnson, the Food and Beverage Manager, that she did not want to work nights during the week and could not work first thing in the morning. (Doc. 32-25 at ¶ 5). Defendant tried to accommodate Plaintiff and, when possible, gave Plaintiff two weekdays off and two weekday morning shifts. *Id.* at ¶ 7.

3

After Plaintiff rejected Arcenaux's advances, Arcenaux changed Plaintiff's schedule so that she worked the night shift more often. (Doc. 39-3 at p. 27). Plaintiff complained to her supervisor, Rhonda Johnson, and Kizzy Smith in Human Resources, but they did nothing. *Id.* at p. 27. Plaintiff often arrived after she was scheduled to begin her shift in the morning. *Id.* Whenever this happened, though, she says that she received approval from Sean Malone or Rhonda Johnson. (Doc. 39-3 at p. 48). Johnson told Plaintiff that she understood that she was a single parent and needed to get her child to school, and that somebody else would open the buffet. *Id.*

In April of 2014, Plaintiff says she received her first review from Rhonda Johnson, and she was told she was doing a good job. (*Id.* at p. 38; 39-4 at p. 18). Shortly after the meeting, however, Arcenaux "cursed out" Plaintiff on the buffet floor. (Doc. 39-3 at p. 41). Plaintiff repeatedly tried to contact Johnson, her supervisor, via text message and email to report his behavior, but Plaintiff received no response. *Id.* at 38.

In March and April of 2014, the other three Assistant Managers complained about Plaintiff. Derek Gaspard said "My experiences with Toni were not great from the start. I have always thought she did not have a good attitude . . . There have been countless times where she hasn't setup anything and just left both managers high and dry to stay there till 12:30am some nights finishing up things that she should have or could have done. . . She also came in two hours late on Sunday, April 13th." (Doc. 32-14). Chauncey Miner also complained "If I ask her to do something I have

4

to come back and double check; instead of asking how it's done. It'll be complet[ely] wrong where I have to do it myself[.] (Doc. 32-13 at p. 1). Ken Arcenaux also complained that "[Plaintiff's] attitude as a manager is very unacceptable . . . [she] has many excuses about why she can't work 10-11 hour[s] a day . . . [and she] has a bad habit of disappearing from the floor[.]" (Doc. 32-12).

Malone also requested that the Director of Surveillance prepare a surveillance report on Plaintiff. (Doc. 32-40 at ¶ 5). Between April 13, 2014 and April 20, 2014, the Defendant monitored where Plaintiff was during her shift, when she arrived, and when she left work. (Doc. 32-41). The report shows that Plaintiff arrived late and left early from work on several occasions. *Id.*

On May 7, 2014, after receiving these complaints and reviewing the surveillance report, Plaintiff's supervisor, Rhonda Johnson, informed Plaintiff that she was being placed on an Action Plan to address various concerns about her job performance. (Doc. 32-15). The Plan notes that "Toni has been late and/or left early for multiple shifts" and states that "Toni must report on time for all scheduled shifts and remain for their entirety. Should there be an emergency; Toni should contact her supervisor before leaving her shift." *Id.* at p. 2. Then two days later, Rhonda Johnson, Sean Malone, and Ken Arcenaux, had a meeting with Plaintiff to address communication issues between Plaintiff and Arcenaux. (Doc. 32-33 at p. 6). During the meeting, Arcenaux apologized "for any disrespect" and everyone agreed to move forward. *Id.*

On July 28, 2014, Plaintiff asked Kizzy Smith in Human Resources if she could apply for a scheduling assistant position, but she responded that Plaintiff could not transfer because she was on the action plan. (Doc. 39-4 at p. 45). Then about a month later, on August 13, 2014, Plaintiff sent the EEOC an intake questionnaire, in which Plaintiff claimed that she was retaliated against. (Doc. 39-5 at p. 61). Plaintiff wrote: "because I told Rhonda [Johnson] that I wouldn't stand for [Arcenaux] treating me disrespectfully I was written up wrongfully and I have been blacked balled and ostracized by [my] fellow employees." *Id.* at p. 62. On August 18, 2017, the EEOC sent a notice of charge of discrimination to Defendant's Human Resources Director, Kizzy Smith. *Id.* at p. 54. On August 22, 2014, Plaintiff met with Malone and Smith. At the meeting, Plaintiff was terminated. (Docs. 32-10 and 40).

On September 24, 2014, Plaintiff amended her charge of discrimination to claim that she was subject to sex discrimination and retaliation. (Doc. 39-5 at p. 65. On September 30, 2014, the EEOC sent Defendant a new notice of charge of discrimination. *Id.* at p. 66. Plaintiff then sued Defendant in this Court on December 13, 2016. (Doc. 1). She filed an Amended Complaint on March 27, 2018. (Doc. 8). Plaintiff claims that Defendant is liable under Title VII of the Civil Rights Act of 1964 for sexual harassment and retaliation. (Doc. 8 at ¶ 23-32).[1]

---

[1] Defendant argues that Plaintiff failed to exhaust her administrative remedies for her race discrimination claim. (Doc. 32-2 at p. 20). Plaintiff, however, makes clear that she is only pursuing a sex discrimination claim and not a race discrimination claim. (Doc. 39 at p. 4).

II. **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and footnote omitted). When determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997) (citing *Brothers v. Klevenhagen*, 28 F.3d 452, 455 (5th Cir.1994)). At this stage, the Court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes.

III. **DISCUSSION**

A. **Title VII Sexual Harassment Claim**

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e–2(a)(1). A plaintiff seeking to hold an employer liable for sexual harassment carried out by the plaintiff's supervisor may prevail by establishing that: (a) the sexual harassment resulted in a tangible employment action, or (b) the supervisor created a hostile work environment.

*See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, (1998); *Giddens v. Cmty. Educ. Centers, Inc.*, 540 F. App'x 381, 387 (5th Cir. 2013). Plaintiff claims that Defendant is liable for sexual harassment under both theories based on Arcenaux's conduct.

1. **Supervisor or Co-Worker**

As a threshold matter, the Court must determine whether Arcenaux was Plaintiff's supervisor even though he had the same Assistant Manager title as Plaintiff. An employee is a supervisor if "the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (quoting *Ellerth*, 524 U.S. at 761.

Here, Plaintiff testified that at some point there were issues with the four Assistant Managers being co-managers, and therefore before April of 2014, the Director of Food and Beverage, Sean Malone, told Plaintiff that Arcenaux "is your supervisor." (Doc. 39-3 at p. 28). At this stage, the Court must accept this testimony as true and find that there is a material dispute of fact about whether Arcenaux was Plaintiff's supervisor. *Coleman*, 113 F.3d at 533. Because the Court concludes that there is a material dispute of fact about whether Arcenaux was Plaintiff's supervisor,

the Court will determine whether the alleged sexual harassment resulted in a tangible employment action and a hostile work environment.

### 2. Tangible Employment Action

Plaintiff claims that Arcenaux took a tangible employment action against her when he changed her work schedule. (Doc. 39 at p. 37-40). A "tangible employment action" is "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. An employee does not suffer a tangible employment action when a supervisor merely "change[s] her work schedule and ask[s] her to perform tasks which she had not previously been asked to perform." *Watts v. Kroger Co.*, 170 F.3d 505, 511 (5th Cir. 1999).

In *Watts*, the plaintiff, a grocery store employee, claimed that she and her supervisor had arranged her schedule to allow her to work a second job. *Watts*, 170 F.3d at 508. After she complained to the store manager that her supervisor was sexually harassing her, her supervisor changed her schedule to force her to give up her second job. *Id.* The Court held that when plaintiff's supervisor changed her schedule, it was not a tangible employment action because it was not a "significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" as the Supreme Court had defined tangible employment actions. *See id.* Like *Watts*, Plaintiff made an arrangement with her employer to accommodate her

schedule, but it was changed after she complained about being sexually harassed. Under Fifth Circuit precedent, Plaintiff has therefore not shown that she was subjected to a tangible employment action.

Plaintiff does not discuss *Watts*, but instead relies on the Supreme Court's more recent decision in *Burlington Northern v. White*, 548 U.S. 53 (2006) to support her argument that her schedule change is a tangible employment action. (Doc. 39 at p. 38). There, the Court noted that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Burlington Northern*, 548 U.S. at 69. At first glance, this statement seems to support Plaintiff's argument that her schedule change is a tangible employment action. But the Court made this statement while interpreting Title VII's anti-retaliation provision, which has a broader reach, than the sex discrimination provision at issue here. *Id.* at 57, 66.

And even after the Supreme Court decided *Burlington Northern*, the Fifth Circuit has approvingly cited *Watts'* holding that a change in work schedule is not a tangible employment action. *See Williams v. Barnhill's Buffet Inc.*, 290 F. App'x 759, 762 (5th Cir. 2008). The Court is bound by the Fifth Circuit's pronouncement that a change in work schedule is not a tangible employment action, and the Court must dismiss Plaintiff's sexual harassment claim based on her allegations that the change in her work schedule was a tangible employment action.

Plaintiff next relies on the cat's-paw theory and argues that there is a dispute of fact about whether Arcenaux took a tangible employment action against her

because he was involved in the decision to terminate Plaintiff. (Doc. 39 at p. 40). Plaintiffs rely on a cat's paw theory "when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any [discriminatory or] retaliatory animus. Under this theory, a plaintiff must establish that the person with a [discriminatory or] retaliatory motive somehow influenced the decisionmaker to take the [tangible employment] action." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015).

Here, the evidence indicates that Malone and Smith fired Plaintiff. (Doc. 40). Plaintiff nonetheless argues that Arcenaux influenced Defendant's decision to terminate her because Arcenaux was involved in the decision to hire her. (Doc. 39 at p. 40). Even if Arcenaux was involved in the decision to hire Plaintiff, that is not alone enough to create a genuine issue of material fact about whether he influenced Defendant's decision to fire her. Plaintiff has pointed to no authority to suggest that a Court may presume that an employee influenced an employer's decision to terminate someone merely because they participated in the decision to hire that employee. Plaintiff's cat's-paw claim is dismissed.

### 3. Hostile Work Environment

Plaintiff also claims that Defendant is liable for creating a hostile work environment claim. (Doc. 8 at ¶ 23–30). The Supreme Court has held that Title VII prohibits "a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a hostile work environment claim, an employee must establish a prima facie case, demonstrating that: (1) the employee

belongs to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of employment. *Aryain v. Wal–Mart Stores Tex. L.P.*, 534 F.3d 473, 479 (5th Cir. 2008). "To affect a term, condition, or privilege of employment, the harassment 'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). Defendant does not dispute the first two prongs of Plaintiff's prima facie sexual harassment claim. (Doc. 32-2 at p. 10–16). Instead Plaintiff focuses on the third and fourth prongs. *Id.*

### A. Because of Sex

On the third prong, Defendant argues that the alleged harassment was not based on a protected class because Plaintiff never complained that she was being harassed because of her sex. (Doc. 32-2 at p. 10–11). The "critical issue" in determining whether workplace activities constitute harassment based on sex is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998) (internal citation omitted). By contrast, "[w]hen the conduct is equally harsh towards men and women, there is no hostile work environment based on sex." *Reine v. Honeywell Int'l Inc.,* 362 F. App'x 395, 397 (5th Cir. 2010). And here, the evidence in the light most favorable to Plaintiff reflects that Arcenaux repeatedly directed sexually charged comments and

made advances toward her, and that he did not direct similar comments to men at L'Auberge. (Doc. at 39-3 at p. 35–47). There is therefore a genuine dispute of material fact about whether Plaintiff was harassed based on her sex.

### B. Severe and Pervasive

On the fourth prong, Defendant argues that the alleged harassment was not sufficiently severe and pervasive. (Doc. 32-3 at p. 11–16). At worst, Defendant contends that "the allegations amount to no more than occasional boorish conduct[.]" *Id.* at p. 16. In determining whether harassment is severe and pervasive, courts must look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Title VII, however, is not a "general civility code," and "simple teasing," "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotations and citations omitted).

Here, the Court concludes that there is a genuine dispute of material fact about whether Plaintiff was subject to harassment that was severe and pervasive. The evidence in the light most favorable to Plaintiff reflects that at least twice each shift Arcenaux made sexually charged comments about her appearance or made sexual advances toward Plaintiff. For example, Arcenaux repeatedly asked Plaintiff to go out for drinks even though she declined. (Doc. 39-3 at p. 36). And once when she

13

declined, he said "I don't know why you're fighting it, you might as well just go on and give in[.]" *Id.* at p. 36. Arcenaux also made sexually charged comments about Plaintiff's appearance, such as "[o]h, who is that coming this way, nice arms, oh, nice legs. Oh, that's just Toni," *id.* at p. 36; "That's a nice skirt you got on. I like the way it fit," *id.* at p. 44, and he told Plaintiff she had nice legs and "ought to wear skirts more often." *Id.* Another time, when Plaintiff was at a concert on her lunch break, Arcenaux waited until Plaintiff had turned around and took a picture of her buttocks and forwarded the photo to other people. *Id.* at p. 37.

This kind of behavior is far from simple teasing, but reflects a pattern of behavior that would humiliate and demean a reasonable person. No person should be forced to endure daily unwelcome advances from co-workers and demeaning comments about one's appearance. Although Defendant disputes that Arcenaux engaged in this behavior, on summary judgment the Court must accept Plaintiff's testimony about what occurred as true. There is therefore a material dispute of fact about whether Plaintiff endured severe and pervasive harassment, and Plaintiff has established a prima facie hostile work environment claim.

Once an employee has established a prima facie case, an employer may raise an affirmative defense to liability if it establishes: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765. Defendant argues that Plaintiff did not inform

it of any alleged harassment, and therefore Plaintiff failed to reasonably avail herself of its workplace harassment policies. (Doc. 32-2 at p. 19).

Here, however, the evidence reflects that Plaintiff told Defendant's Human Resources Director, Kizzy Smith, that she was being harassed by Arcenaux well-before she was terminated. In a recording of the meeting where Defendant terminated Plaintiff, Plaintiff told Smith that "I came to you in January and told you the stuff that I was going through and the way [Arcenaux] was talking to me in that buffet, and it was considered harassment. I came to you. And you told me keep me posted. I came in January and I come back before, and nothing has happened, Kizzy." (Doc. 40 at 6:15–6:33). Kizzy Smith agreed that Plaintiff complained about Arcenaux, but disagreed that she had been harassed. Smith said that "the things that you were saying, the comments that he's making, yes it's offensive comments, but it wasn't necessarily harassment, so we addressed it in that sense." *Id.* at 9:18–9:28. As the Court has already explained, there is a genuine dispute of material fact about whether Arcenaux sexually harassed Plaintiff, and therefore Smith's claim that Arcenaux did not harass Plaintiff is unavailing. Because Plaintiff told Defendant that she was being harassed before she was terminated, Plaintiff reasonably availed herself of Defendant's workplace harassment policies.

C.  **Title VII Retaliation Claim**

Plaintiff also claims that Defendant retaliated against her in violation of Title VII. To establish a prima facie retaliation case, an employee must show: (1) that she engaged in protected activity; (2) that she was subjected to an adverse employment

15

action; and (3) a causal connection exists between the protected activity and the adverse employment action. *LeMaire v. Louisiana Dept. of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007). Once an employee has established her prima facie case, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *LeMaire*, 480 F.3d at 388 (citing *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754–55 (5th Cir. 2005)). "After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Id.* at 388–89 (citing *Baker*, 430 F.3d at 755).

Even assuming Plaintiff made a prima facie retaliation case, her retaliation claim fails because even the evidence in the light most favorable to Plaintiff shows that Defendant terminated Plaintiff for legitimate, non-retaliatory reasons. Defendant argues that it had a legitimate, non-retaliatory reason for terminating Plaintiff because she was often late for work and had other performance issues. (Doc. 32-2 at p. 32). Because Defendant offers a legitimate non-retaliatory reason for terminating Plaintiff, the burden now shifts back to Plaintiff to show that "the defendant's proffered reason is not true, but instead is a pretext for intentional discrimination." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). A plaintiff may demonstrate pretext by "showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (internal quotation marks omitted). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Id.*

Plaintiff argues that "her fellow employees' sentiments, which formed the basis of the reports management referenced as a reason for her termination, were unjustly biased and founded in workplace animosity." (Doc. 39 at p. 58). Whether Plaintiff's contention is true, though, is not the issue. The issue is "whether the employer reasonably believed the employee's allegation[s] and acted on [them] in good faith." *Jackson v. Cal–Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010). "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination. *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991). A plaintiff's "assertion of innocence alone does not create a factual issue as to the falsity" of the defendant's explanation for terminating her. *Jackson*, 602 F.3d at 379.

Here, though, while Plaintiff contends that she did get along with co-workers and that that she had permission to arrive late or leave early, even the evidence in the light most favorable to Plaintiff fails to show that Defendant did not act in good faith or reasonably believe the various complaints about her performance issues and lateness. There is well-documented evidence that other employees complained about Plaintiff. As previously noted, in March and April of 2014, the other three Assistant Managers complained about Plaintiff. Derek Gaspard said "My experiences with Toni were not great from the start." (Doc. 32-14). Chauncey Miner also complained "If I ask her to do something I have to come back and double check; instead of asking how it's done. It'll be completing wrong where I have to do it myself[.] (Doc. 32-13 at p. 1). Ken Arcenaux also complained that "[Plaintiff's] attitude as a manager is very

17

unacceptable . . . [she] has many excuses about why she can't work 10-11 hour a day . . . [and she] has a bad habit of disappearing from the floor[.]" (Doc. 32-12 at p. 1).

Further still, the surveillance audit showed that Plaintiff often arrived late and left early. (Doc. 32-41). Based on these complaints, Plaintiff's supervisor, Rhonda Johnson, informed Plaintiff that she was being placed on an Action Plan to address various concerns about her job performance. (Doc. 32-15). The Plan notes that "Toni has been late and/or left early for multiple shifts" and states that "Toni has at times displayed an inability to build an atmosphere of teamwork ." *Id.*

Plaintiff has therefore failed to show that Plaintiff's legitimate non-discriminatory reasons for terminating her were pretextual. Defendant relied on several complaints from various employees about Plaintiff's job performance, and a surveillance audit confirmed that Plaintiff often arrived late and left early. Plaintiff's Title VII retaliation claim is dismissed.

IV. **CONCLUSION**

Accordingly,

**IT IS ORDERED** that the **Motion for Summary Judgment (Doc. 32)** is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Plaintiff's Title VII retaliation claim, and it is **DENIED** as to Plaintiff's Title VII sexual harassment claim.

**IT IS FURTHER ORDERED** that Plaintiff's Title VII retaliation claim is **DISMISSED WITH PREJUDICE**.

Baton Rouge, Louisiana, this 13th day of July, 2018.

_____
**BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**